THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BIOMED REALTY, L.P.,

                Plaintiff,

     v.

700 DEXTER, LLC,

                Defendant.

CASE NO. C15-0930-JCC

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

This matter was tried to the Court from October 17, 2016 to October 20, 2016. The claim presented for adjudication was whether Plaintiff BioMed Realty, L.P. was entitled to specific performance of the purchase and sale agreement it entered into with Defendant 700 Dexter, LLC. After a bench trial and pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

1. This is a commercial real estate dispute over a piece of property ("the Property") located at 700 Dexter Avenue North in Seattle's South Lake Union neighborhood.

2. For many years, the Property was owned by American Linen Supply Company, an industrial drycleaner whose operations on the Property resulted in extensive environmental contamination. This contamination underlies the legal disputes in this case.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 1

*The Parties*

3. Plaintiff BioMed Realty, L.P. is a Maryland limited partnership whose general partner is a Maryland corporation with its principal place of business in California.

4. Defendant 700 Dexter, LLC is a limited liability company with members who are citizens of Colorado, Texas, Ohio, Oregon, and Washington.

5. Dexter is a single-asset LLC formed specifically to acquire the Property, remediate the environmental contamination, and sell the Property. Frontier Renewal, LLC is Dexter's managing member and is responsible for the oversight, management, and remediation of the Property on Dexter's behalf.

*The Purchase and Sale Agreement*

6. On October 26, 2011, the parties entered into a purchase and sale agreement ("the PSA") by which Dexter agreed to sell the Property to BioMed. Dexter did not own the Property at that time, but had a contractual right to purchase the Property from American Linen. The PSA provided for a three-way closing, in which Dexter would close its purchase of the Property from American Linen simultaneously with closing the sale to BioMed.

7. Under the PSA, Dexter was responsible for developing a remediation plan for the Property and any off-property locations to which the environmental contamination had spread.

8. The purchase price was $18,000,000. Per the PSA, BioMed deposited $1,440,000 as an earnest money deposit. Out of these funds, $900,000 was transferred to an escrow account. That money was subsequently distributed to Dexter to compensate it for expenses incurred in remediating the Property. Dexter used this amount without objection from BioMed. The balance of $540,000 remains in escrow.

9. Article 8 of the PSA pertains to closing and contains multiple closing conditions. The PSA states that these conditions are "for the benefit of Buyer and may only be waived by Buyer in its sole but reasonable discretion."

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 2

10. Two closing conditions are particularly relevant to this dispute: (1) the prohibition on actual or threatened claims against the Property and (2) the receipt of a satisfactory opinion letter from the Washington State Department of Ecology ("Ecology").

11. Regarding claims against the Property, Section 8.1(e) of the PSA states that "[n]o suit, action, claim or other proceedings shall have been instituted or threatened against" Dexter or the Property. At the time the parties executed the PSA, there were no actual or threatened claims against Dexter or the Property.

12. Regarding the opinion letter from Ecology, Section 8.1(l) of the PSA states that "Seller shall have obtained the Opinion Letter pursuant to Section 5.1(b)" and "Buyer shall have accepted or been deemed to accept the Opinion Letter pursuant to Section 5.1(b)."

13. Section 5.1(b) was subsequently replaced by the Fifth Amendment to the PSA. This amendment states, in relevant part:

> Seller shall obtain from [Ecology] an opinion letter ("the Opinion Letter") regarding the remediation of environmental contamination required to obtain a [No Further Action (NFA)] Letter for the Land and any Off-Property Cleanup Obligations from [Ecology] or a comparable letter from any other applicable government entity . . . . The Opinion Letter may require ongoing monitoring and remediation of the Land by Seller if such monitoring and remediation did not and will not materially interfere with Buyer's use or development of the Land; *provided, however, that under no circumstances shall the Opinion Letter require ongoing monitoring, remediation or other access to the area that will be directly underneath any building or other permanent structure to be constructed by Buyer.*

(Emphasis added.)

14. This condition required Dexter to develop a cleanup action plan (CAP) and submit it to Ecology. If Ecology deemed the CAP adequate, it would issue a "No Further Action Likely" letter. This letter signified that, if the CAP was followed, Ecology was likely to issue an NFA letter upon completion of remediation as described in the CAP.

15. Under Section 8.4 of the PSA, closing would occur on or before the thirtieth day after "receipt of the Opinion Letter."

16. The PSA also includes a closing condition regarding financial assurances, found in Section 8.1(q). This provision states, in part:

> Buyer and Seller shall have agreed on the form of financial assurances Seller shall provide to Buyer at closing to cover costs to be reasonably incurred to obtain an NFA Letter for the Land and an NFA Letter for Hazardous Materials that may have migrated from the land to adjacent property ("Off-Property Contamination"), plus any third-party claims arising from Hazardous Materials on the Land or Off-Property Contamination.

17. The PSA provides that "Buyer may waive any of the conditions set forth in this Section 8.1 by delivery of written notice to Seller on or before the Closing."

18. The PSA further provides: "If any provision of this Agreement, or any portion of any provision, is held to be unenforceable or invalid, the remaining provisions and portions shall nevertheless be carried into effect."

*March 2014 Ecology Letter*

19. On January 31, 2014, Dexter submitted its CAP to Ecology.

20. On March 21, 2014, Ecology issued a "No Further Action Likely" letter. The letter provided, in part:

> Soil vapor monitoring will be necessary for those areas of the Site where soil or groundwater concentrations exceed levels that are not protective for purposes of vapor intrusion. . . . In those areas where subsurface contamination is not protective of air, subslab sampling will be necessary.
>                        . . .
> A condition for the assessment of the adequacy of the cleanup involves collection of confirmation samples in soil and groundwater that corroborate that cleanup levels have been attained throughout the Site. Additionally, for the remedy involving edible oil substrate (EOS) injection, active management of the injection point locations and timing of injections will be necessary to achieve cleanup in a reasonable timeframe as defined by Ecology.

21. The parties disagree as to whether the March 2014 letter satisfies the PSA, specifically whether the letter requires remediation to be conducted "underneath any building or other permanent structure to be constructed by" BioMed.

22. Dexter's expert, Dan Jacobs, testified that the March 2014 letter did not require any

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 4

ongoing monitoring, remediation, or access directly underneath any building or that would materially interfere with BioMed's use and development of the land. Jacobs stated that "we had a gap of time in between when closing was going to happen and when BioMed could start their development, and anything that we needed to get done, we could get done in that focused period of time." Jacobs testified that the timeframe for on-site remediation was ten to eleven weeks after receipt of the opinion letter.

23. This testimony was contradicted by BioMed's expert, Jeremy Porter, who testified that the March 2014 letter was "not fully consistent" with the requirements of the PSA. Porter stated that the letter contained a "number of instances . . . where Ecology does provide circumstances that would require monitoring or remediation."

24. For example, Porter testified as to the involved nature of the collection of confirmation samples throughout the site. He stated that this process would require a large, truck-sized machine that would drill 70-80 feet down, and that to access soil "throughout the Site," one must take samples throughout the site, not merely at the boundaries. Porter noted that Ecology typically requires a sampling program that lasts until cleanup levels are attained, which can involve multiple sampling events that occur "at least every few months over the course of a year or so."

25. Porter also noted that the active management of the EOS injections "means ongoing work" that "takes a very long time" and is "not a quick remedy." Porter stated that it can take months to develop the proper conditions and then "quite a bit longer to actually treat the contamination." Porter testified that that "this whole process for edible oil remedies . . . often takes quite a number of years to actually clean up."

26. Likewise, Porter testified that the soil vapor monitoring requirement would be done "not just, you know, now or in the near future, but farther out as the remediation progresses."

27. Having observed the testimony and considered the evidence, the Court credits Porter's testimony as to the ongoing monitoring, remediation, and access required by the March

1  2014 letter.

2  *Washington Builders Claim*

3  28. In late March 2014, Dexter also received notice of a potential claim from a neighboring

4  property owner, Washington Builders, LLC. Washington Builders alleged that a plume of

5  contaminants originating from the Property was damaging Washington Builders's

6  property. Dexter notified BioMed of the potential claim.

7  29. In April 2014, Dexter began negotiations with Washington Builders to attempt to resolve

8  the threatened claim. As part of that effort, Dexter entered into multiple "standstill"

9  agreements, pursuant to which Dexter promised not to purchase the Property from

10  American Linen or sell it to BioMed.

11  30. The first standstill agreement was entered into on April 4, 2014. The second was entered

12  into on April 10 and continued through April 29. Dexter entered further standstill

13  extensions on April 29 and May 8.

14  31. On June 3, 2014, Washington Builders sent Dexter a draft alternative dispute resolution

15  (ADR) agreement that included a release of claims. The proposed release stated:

16  Washington Builders releases Washington Builders' Claims against any future
purchaser, lender, owner or investor in the 700 Dexter Property, whether
17  known or unknown. This release shall not apply to [American Linen] or
Dexter or any current or previous lender, owner, or investor in the 700 Dexter
18  Property. [American Linen] and Dexter shall require as a condition of selling
the 700 Dexter Property that [BioMed] and the entity that acquires title to the
19  700 Dexter Property release claims against Washington Builders arising out of
the 700 Dexter Contamination.
20

21  32. Meanwhile, BioMed and Dexter began to negotiate a Sixth Amendment to the PSA. As

22  part of these negotiations, BioMed sought to obtain a release from Washington Builders's

23  parent company, Vulcan, Inc., that would "apply to all subsidies and affiliates, and cover

24  any current and/or future claims." BioMed also proposed a requirement that a consent

25  decree be obtained from Ecology. The parties continued to negotiate for the next nine

26  months, but ultimately did not reach an agreement on the Sixth Amendment.

33. Dexter and Washington Builders continued to enter standstill agreements through mid-December 2014.

34. On May 15, 2015, Washington Builders sent Dexter an updated draft of the ADR agreement. The new draft removed all language regarding a release.

*Purchase of Property from American Linen*

35. By early 2015, American Linen was facing significant financial hardship and contemplated filing for bankruptcy.

36. Dexter feared that American Linen's bankruptcy would interfere with Dexter's purchase of the Property. However, Dexter would need a loan to fund the purchase prior to closing with BioMed.

37. In March 2015, Dexter prepared an "Investment Memorandum" for potential lenders. In preparing the memorandum, Dexter obtained a broker's opinion that the Property was worth "$28M for a methodical sale, or $24M for a very quick sale." The memorandum continued: "Since the BioMed purchase price is $18M and fair market value is $24M, it's actually a favorable outcome if BioMed doesn't close." The memorandum stated that, if the PSA was terminated, Dexter would sell the property to another buyer, and "the market in Seattle and particularly the South Lake Union area is very active, and finding another buyer would be easy."

38. On April 6, 2015, Dexter's environmental consultant wrote Jacobs the following e-mail:

> Tom tells me you will be in town this week, to do a site walk for a prospective "new" Buyer! Great – congrats! ;>)
>
> Please let me know if I need to meet with you and Buyer on Property, or at my offices, to give cleanup status[.]

Jacobs responded:

> I am fine for the meeting with the "buyer". . . . Also, this potential buyer is highly highly confidential. We do not want this information getting out here to the public.

1
2

39. As part of the loan application process, Jacobs walked the Property with an appraiser on April 9, 2015.

3
4
5
6
7
8
9

40. At trial, Jacobs testified that when he wrote "buyer" in the e-mail, he meant the lender with whom he conducted the walk-through. When asked why the lender needed to be confidential, Jacobs stated that Dexter "wanted it to be kept confidential that we were in the process of acquiring the property, mostly as it related to what Vulcan might do, as it was explained to me." The Court finds it strange that Jacobs would use the word "buyer" in this context. However, given the use of quotations in the e-mails and the lack of other evidence of a new buyer, the Court accepts this explanation.

10
11
12

41. On April 29, 2015, Dexter amended its LLC agreement to provide bonuses to certain members if the purchase price for the Property exceeded $18,000,000. The bonus amounts corresponded to the amount by which the purchase price exceeded $18,000,000.

13

42. On April 30, 2015, Dexter completed the purchase of the Property from American Linen.

14

*Termination of the PSA and Ensuing Litigation*

15
16
17
18

43. On May 20, 2015—five days after receiving the updated ADR agreement from Washington Builders—Dexter terminated the PSA. Dexter stated that it was impossible to fulfill the closing conditions because it had not been able to resolve the dispute with Washington Builders and did not reasonably expect to be able to do so in the future.

19
20

44. On May 27, 2015, BioMed initiated the present suit seeking specific performance of the PSA or, in the alternative, monetary damages.

21
22
23

45. On March 30, 2016, the Court denied Dexter's motion for summary judgment, concluding that, if closing had not been triggered, Dexter's termination was premature because BioMed had the right to waive conditions up until the time of closing.

24
25
26

46. On July 27, 2016, BioMed informed Dexter that it would have a corporate representative testify at trial that it would waive all closing conditions as part of its claim for specific performance. At trial, BioMed waived all such conditions.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 8

## II. CONCLUSIONS OF LAW

47. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

48. Venue is properly set in the United States District Court, Western District of Washington pursuant to 28 U.S.C. § 1391, because the Property is located in this district.

49. Specific performance may be granted if "a valid contract exists, a party has threatened or is threatening to breach the contract, the terms of the contract are clear, and the contract is not the product of fraud or unfairness." *Pardee v. Jolly*, 182 P.3d 967, 973 (Wash. 2008). Specific performance is "frequently the only adequate remedy for a breach of contract regarding real property because land is unique and difficult to value." *Id.*

50. Dexter raises multiple arguments against an award of specific performance. As discussed below, the Court disagrees on all counts.

51. *Financial Assurances*: Dexter argues that the PSA's financial assurances provision is an agreement to agree, rendering the PSA unenforceable. An agreement to agree is "an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete." *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 948 (Wash. 2004) (internal quotations omitted). "Agreements to agree are unenforceable in Washington." *Id.* The financial assurances provision provides that the parties "shall have agreed" on the form of financial assurances. But, even assuming that this language is unenforceable, the provision is subject to the PSA's severability clause. Moreover, it is a term included for BioMed's benefit that BioMed has the sole discretion to waive—which BioMed has. Thus, regardless of whether the financial assurances clause is valid, the PSA is otherwise enforceable.

52. *Repudiation*: Dexter asserts that BioMed repudiated the PSA by demanding new contract terms. Under Washington law, a contract is repudiated when a party makes a "positive

1    statement or action . . . indicating distinctly and unequivocally that he either will not or

2    cannot substantially perform any of his contractual obligations." *Wallace Real Estate*

3    *Inv., Inc. v. Groves*, 881 P.2d 1010, 1019 (Wash. 1994) (internal quotes omitted). Here,

4    however, the evidence shows that BioMed proposed terms as part of an ongoing

5    negotiation of an amendment to the PSA. This did not constitute repudiation.

6    53. *Opinion Letter – Failure to Timely Close/Waiver:* Dexter argues that, under the PSA,

7        receipt of an opinion letter—any opinion letter—triggers closing. This untenable reading

8        ignores the PSA's plain language. Rather, the PSA demands that an *adequate* opinion

9        letter be received, including the requirement it may "under no circumstances require

10       ongoing monitoring, remediation or other access to the area that will be directly

11       underneath any building or other permanent structure to be constructed by Buyer." Per

12       Porter's testimony, the March 2014 Ecology letter did not satisfy this requirement and

13       thus did not trigger closing. Moreover, the subsequent standstill agreements and

14       amendment negotiations constitute a course of dealing that negates Dexter's suggestion

15       that it expected to close in April 2014. Thus, the Court declines to find that BioMed

16       failed to timely close or waived its rights under the PSA.

17   54. *Equitable Estoppel*: Equitable estoppel has three elements: (1) an admission, statement,

18       or act inconsistent with the claim afterwards asserted; (2) reliance by the other party on

19       such admission, statement, or act; and (3) injury to the other party resulting from

20       allowing the first party to contradict the admission, statement, or act. *Alcorn Trailer City,*

21       *Inc. v. Blazer*, 572 P.2d 15, 20 (Wash. Ct. App. 1977). Dexter asserts that BioMed should

22       be equitably estopped from obtaining specific performance because it could have waived

23       the unsatisfied closing conditions two and a half years ago. However, there is no

24       inconsistent admission, statement, or act upon which Dexter detrimentally relied. BioMed

25       previously declined to waive the conditions precedent—as was its contractual right—but

26       stated that this was not a final decision. Because Dexter prematurely terminated the PSA,

1    the deadline for the decision on waiver of closing conditions never passed. Equitable

2    estoppel is inapplicable here.

3    55. *Laches/Unclean Hands*: The defense of laches is likewise inapplicable. "Laches is the

4        inexcusable delay in asserting a right." *Matter of Tuott's Estate*, 606 P.2d 706, 707

5        (Wash. Ct. App. 1980). BioMed's delay in waiving the closing conditions was not

6        inexcusable; rather, it was based on BioMed's reasonable position that the time for

7        closing had not yet come and on BioMed's contractual right to determine whether to

8        waive the closing conditions. The Court thus rejects Dexter's assertion that BioMed's

9        claim is barred by laches or the doctrine of unclean hands.

10   56. *Impossibility/Frustration of Purpose/Failure to Satisfy Condition Precedent*: Specific

11       performance will be denied "where performance is impossible." *Hallauer v. Certain*, 575

12       P.2d 732, 737 (Wash. Ct. App. 1978). Dexter maintains that specific performance is

13       impossible and the purpose of the contract has been frustrated, because Ecology is no

14       longer issuing NFA letters and because Dexter cannot obtain a release from Washington

15       Builders/Vulcan. Dexter likewise argues that the inability to satisfy these closing

16       conditions excuses its performance, because it acted in good faith to satisfy them. These

17       arguments are moot, given that BioMed has waived these conditions. Moreover, Dexter

18       has not demonstrated that impossibility existed when it terminated the PSA. The evidence

19       shows that Washington Builders was still attempting to negotiate with Dexter at the time

20       it terminated; Dexter's feeling that it would be fruitless does not excuse its performance,

21       particularly where BioMed still had the option to waive the condition.

22   57. *Hindrance of Performance*: "Proof of a party's interference with the performance of the

23       other party's obligation under the contract will work to discharge the other party's duty."

24       *Jones Assocs., Inc. v. Eastside Props., Inc.*, 704 P.2d 681, 987 (Wash. Ct. App. 1985).

25       Dexter argues that BioMed hindered its performance by demanding new contract terms.

26       But, as discussed above, these actions were in the context of amendment negotiations that

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 11

1     lasted nine months. Ongoing negotiations among the parties cannot be construed as

2     hindrance. Dexter further argues that BioMed hindered its performance by objecting to

3     the March 2014 Ecology letter and refusing to close on time. However, given that the

4     March 2014 letter did not satisfy the PSA, BioMed's actions were justified and

5     legitimate.

6   58. *Mutual Mistake*: Finally, Dexter argues that the PSA is not enforceable under the doctrine

7       of mutual mistake. Rescission of a contract is appropriate when there is a "clear bona fide

8       mutual mistake regarding a material fact." *Simonson v. Fendell*, 675 P.2d 1218, 1221

9       (Wash. 1984). The test of materiality is whether the parties would have entered into the

10      contract had they been aware of the mistake. *Id.* Here, Dexter has identified no such

11      material fact, instead merely rehashing its previous arguments about enforceability and

12      closing conditions.

13  59. *Specific Performance is Appropriate*: Based on the facts and conclusions set forth above,

14      the Court determines that the PSA is a binding and enforceable contract that Dexter

15      breached without justification. The parties specifically negotiated for specific

16      performance as a remedy in the event Dexter breached the PSA. Although Dexter will not

17      get the benefit of the increase in value of the Property, Dexter never bargained for, nor

18      obtained, any right to the increase in value. The Property is unique and cannot be

19      replicated. Thus, damages are not an adequate remedy for Dexter's breach and an order

20      of specific performance is consistent with the principles of equity. The Court hereby

21      ORDERS that BioMed is entitled to specifically enforce the PSA with the exception of

22      the closing conditions that it has waived.

23  60. *Amount Owed to Dexter*: The purchase price of the Property was $18,000,000. From this

24      amount, the $1,440,000 that BioMed deposited into escrow should be deducted.

25      Additionally, under the PSA, $1,800,000 was to be held in escrow after closing and not

26      paid to Dexter until it received an NFA Letter from Ecology. Jacobs testified that

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 12

1    obtaining an NFA Letter is no longer possible, but Dexter always expected it would take

2    five to seven years to obtain an NFA Letter based on its CAP. Thus, Dexter could never

3    have obtained the holdback amount, and it must be deducted from the purchase price.

4    The purchase price is $14,760,000.

5    61. *Attorney Fees*: The PSA contains an attorney fees provision, which entitles the prevailing

6    party to recover from the non-prevailing party "all costs and expenses (including

7    attorneys' fees and court costs) incurred in such action." BioMed is the prevailing party.

8    BioMed shall detail its expenses to the Court within 14 days of entry of these findings

9    and conclusions. The amount of the expense award, as determined by the Court, will be a

10    credit against the purchase price for the Property.

11    62. Accordingly, the Court finds in favor of BioMed. Specific performance shall occur

12    pursuant to the provisions of the forthcoming Decree of Specific Performance, which

13    shall be issued once the Court has determined the amount of expenses to which BioMed

14    is entitled.

15    It is so ORDERED.

16    DATED this 8th day of November 2016.

17

18

19

20

21    _____

22    John C. Coughenour

23    UNITED STATES DISTRICT JUDGE

24

25

26